UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

JOHN HERBERT CRISP,                    )
                                       )
                Petitioner,            )
                                       )        No. 1:04-CV-218/1:00-CR-38
v.                                     )
                                       )        Judge Curtis L. Collier
UNITED STATES OF AMERICA,              )
                                       )
                Respondent.            )


## M E M O R A N D U M

This matter comes before the Court on the motion of *pro se* petitioner John Herbert Crisp

("Petitioner") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Court File

No. 1).  Petitioner filed a brief in support of his motion (Court File No. 2).  Pursuant to the Court's

Order (Court File No. 3), the Government filed a response to Petitioner's motion (Court File No. 6).

After careful consideration of the motion and briefs and for the reasons discussed below, the Court

will **DENY** Petitioner's motion to vacate, set aside, or correct his sentence.[1]


## I.      FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2000 Petitioner was indicted on eleven counts.  He was charged with (1)

conspiracy to commit bank robbery in violation of 18 U.S.C. § 371 (count one); (2) bank robbery

---

[1]In accordance with Rule 4(b) of the Rules Governing Section 2255 Proceedings, the Court has considered all of the pleadings and filings in petitioner's § 2255 motion filed herein, which will be cited by the Court File Number assigned to the particular pleading or motion (*e.g.*, "Court File No. 1"), and all the files, records, transcripts, and correspondence relating to Petitioner's conviction in Criminal Docket No. 1:00-CR-38, which will be referred to by the Court File Number assigned to the particular matter in the underlying criminal case (*e.g.*, "Crim. Court File No. 1").

with use of a dangerous weapon in violation of 18 U.S.C. § 2113(a), (d) (counts two & six); (3) bank robbery with forced accompaniment in violation of 18 U.S.C. § 2113(a), (e) (counts three & seven); (4) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (counts four & nine); (5) using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) (counts five & ten); and (6) engaging in a monetary transaction involving property derived from a specified unlawful activity in violation of 18 U.S.C. § 1957 (counts eleven & twelve). Also charged in the indictment were Thomas Nichols ("Nichols") and Carlton Smith ("Smith").

After the indictment was returned, Defendant entered a plea of "not guilty," and along with Nichols and Smith, proceeded to trial before a jury of his peers. Petitioner was found guilty beyond a reasonable doubt on all charges. Before sentencing, a presentence investigation report ("PSR") was prepared. Petitioner's range under the United States Sentencing Guidelines ("Guidelines") for imprisonment, based on a total offense level of 35 and a criminal history category V, was 262 to 327 months (Presentence Investigation Report ("PSR"), ¶ 153). However, because Petitioner had two prior convictions under 18 U.S.C. § 924(c)(1), his effective Guideline range for imprisonment was 562 to 627 months (*Id.*).

On March 9, 2001 the Court sentenced Petitioner to a term of imprisonment of 627 months (Crim. Court File No. 190). A final judgment was entered on March 30, 2001 (Crim. Court File No. 155).[2] Petitioner appealed his sentence to the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"). The Sixth Circuit affirmed Petitioner's conviction and sentence on February 18,

---

[2] The judgment was later amended to clarify what counts the term of imprisonment was based upon (*See* Crim. Court File No. 190).

2003 (Crim. Court File No. 184). The Sixth Circuit summarized the facts of the case as follows:

In 1995, Douglas Daigle ("Daigle"), an unindicted co-conspirator, began planning the first of several bank extortions that took place over the course of sixteen months in Knoxville, Chattanooga, and Clarksville, Tennessee. Soon thereafter, Daigle asked his wife, Capri Daigle ("Capri"), to assist him with the bank extortion. Using information contained in a city directory and aerial maps of Knoxville, Daigle learned the locations of various banks and homes of bank managers. Daigle planned to target the homes of female branch managers for a home invasion. Once inside the branch manager's home, Daigle would abduct the branch manager's family and hold them hostage in order to force the manager to take a large sum of cash from the bank's vault and deliver it to a specified location to save her family from being killed. In the course of planning the Knoxville extortion, Daigle recruited several additional individuals including his wife's mother, Dena Farmer; her mother's live-in boyfriend, Ted Roberts; and [Petitioner].

In preparation for the Knoxville extortion, the five co-conspirators purchased communications equipment and obtained three firearms. Daigle selected the First American Bank as the target, and, along with Roberts and [Petitioner], conducted surveillance from behind the branch manager's house. Capri played the role of the branch manager as she and Daigle drove the routes involved to test the radio equipment.

On September 5, 1995, around 9:30 p.m., Daigle and [Petitioner] forcibly invaded the home of Patricia Farry, branch manager of First American Bank. Once inside, they chained Mr. and Mrs. Farry's ankles, placed pillowcases over their heads, and explained that their purpose was to rob the bank. The Farrys' daughter remained asleep in her bedroom. Daigle questioned Mrs. Farry about the bank's security systems and how much money the vault contained. He told Mrs. Farry that she was to go to the bank as usual the next morning, remove the money, and deliver it to a specified location. If she failed to do so by 9:00 a.m., her husband would be killed with a bomb that would be strapped to him inside a van. Throughout the night, Daigle continued to go over the plan with Mrs. Farry and explained to her how to use the radio equipment and how to disarm the bomb.

Early the next morning, Mr. Farry was removed from the home. Mrs. Farry was told that her husband was taken to another location, which would be disclosed to her once she delivered the money. In actuality, Mr. Farry was taken outside into the yard where he was held at gunpoint by [Petitioner] until Mrs. Farry left for the bank.

When Mrs. Farry arrived at the bank, she explained the situation to her employees and asked for their cooperation. The vault was emptied and Mrs. Farry returned to the vehicle with bags of money and waited for Daigle to radio her the drop-off

location. After Mrs. Farry made the drop as directed, she was told to walk to a specified phone booth at a nearby Waffle House restaurant to await further directions regarding the location of her husband. The phone call never came. After Mrs. Farry left for the bank, Daigle and [Petitioner] had moved Mr. Farry back to the master bedroom where they wrapped him in duct tape and chained him to the bed. The bomb was a fake.

Roberts retrieved the money from the drop-off location and met Daigle to divide the proceeds. Next, Farmer and Roberts delivered [Petitioner]'s share to his residence in Greenback, Tennessee. Daigle and his wife fled Knoxville and went to the Pigeon Forge-Gatlinburg area. A few days later, Daigle told Capri that he had thrown the gun he used into an overgrown area near Interstate 40. When Capri began cooperating with the FBI, she disclosed this location and the gun was found in March 2000. Although Farmer, who also cooperated with the FBI, testified that [Petitioner] told her that he had buried his gun, no other weapons used in the Knoxville extortion were discovered.

By the winter of 1996, Daigle was running out of money and decided to target another bank. Farmer loaned Daigle $5,000 of Roberts's share of the proceeds from the Knoxville extortion to finance the second extortion in Chattanooga. The same plan was to be implemented, only this time defendant Nichols was to join Daigle as an "inside man."

On March 14, 1996, Daigle and Capri, along with Roberts and Farmer, met Nichols and [Petitioner] at a Cracker Barrel restaurant in Chattanooga to prepare for the extortion. Daigle had selected a SunTrust Bank in Chattanooga as their target. The branch manager, Teresa Bailey, lived just across the state line in Rossville, Georgia.

At about 8:00 p.m., Daigle arrived at the Bailey home under the pretense of purchasing a puppy that the Baileys had advertised. Once inside, Daigle pulled a gun and explained his plan to extort money from Mrs. Bailey's bank. Nichols, also armed, entered and they held Mrs. Bailey hostage at gunpoint until her husband and son arrived home for the evening. The entire family was bound. Mrs. Bailey's son was tied to his bed and Mr. Bailey was taken to the garage where he was held face down on the floor at gunpoint all night. Mrs. Bailey was told that her husband had been taken away in a van with a bomb strapped to him.

The next morning, Mrs. Bailey and her son went to the bank, gathered the money, and delivered it to the drop-off site as instructed over the radio by Daigle. Mrs. Bailey was told that her husband was at home with the bomb. Like the previous occasion, the bomb was a fake. Upon arriving home, Mrs. Bailey learned that her husband had freed himself after Daigle and Nichols had left him.

4

Nichols retrieved the money from the drop-off site and met Capri at the same Cracker Barrel restaurant to load the money into her car. After dividing the money, the conspirators returned to Knoxville and the money was divided between Nichols, Daigle, and Roberts. Daigle instructed Nichols to get rid of the weapons used in the extortion. Once again, Daigle and Capri fled to the Gatlinburg area.

Several months later, in the summer of 1996, Daigle began to plan what would be the third and final extortion. He selected the First American Bank located in Clarksville. Smith, who was introduced to Daigle by [Petitioner], joined the plan and was to accompany Daigle into the victim's home. Nichols would conduct surveillance as the "outside man." The modus operandi was the same as the Knoxville and Chattanooga extortions.

On December 12, 1996, while branch manager Carolyn Pierce was still at work, Daigle entered her home under the guise of a real estate agent. Mrs. Pierce's father, Leonard Beaudoin, and his wife, who were babysitting the Pierces' son, unsuspectingly allowed Daigle into the home. Once inside, Daigle held the Beaudoins and their grandson hostage at gunpoint. According to Mr. Beaudoin's testimony, an armed man wearing a ski mask and gloves, later identified as Smith, joined Daigle. Shortly thereafter, Mr. Pierce arrived home from work and was immediately bound and blindfolded. When Mrs. Pierce arrived home, Daigle explained his demands and told her that her husband would be killed by a bomb if she did not comply. At one point during the night, Daigle forced Carolyn Pierce to disrobe from the waist down and threatened to rape her while her family watched. Daigle also threatened that he would force her husband to perform oral sex on Smith. During the night, Mr. Beaudoin managed to hide some of Smith's cigarette butts in a waste basket. The butts were later determined to contain the DNA of Smith.

On the way to the bank the following morning, Mrs. Pierce dropped Daigle off near a McDonald's restaurant, where he and Capri instructed Mrs. Pierce via radio. She proceeded to the bank, withdrew the money, and left it in her pickup truck at the location specified by Daigle. Smith and Nichols placed Mr. Pierce, who was still bound and blindfolded, into his vehicle and drove him to the parking lot of a Waffle House restaurant where he was later found.

Smith, [Petitioner], and Nichols were indicted and tried in the Eastern District of Tennessee at Chattanooga. Daigle was arrested but committed suicide before trial. Evidence at trial included the testimony of co-conspirators, Capri and Farmer, who cooperated with the FBI.

*United States v. Smith*, 320 F.3d 647, 650-52 (6th Cir. 2003).

On April 25, 2003, the Sixth Circuit denied Petitioner's petition for rehearing and for rehearing en banc. Petitioner filed the current petition to vacate, set aside, or correct his conviction pursuant to 28 U.S.C. § 2255 on July 20, 2004 (Court File No. 1). The petition was timely filed within the statutory one-year limitation period. 28 U.S.C. § 2255(1).[3]

Having reviewed the materials thus submitted, together with the complete record of the underlying criminal case, the Court finds they conclusively show Petitioner is not entitled to relief on the claims asserted. Accordingly, the Court will decide the matter without an evidentiary hearing, explaining its reasoning as it addresses each of Petitioner's asserted grounds for relief. *See United States v. Todaro*, 982 F.2d 1025, 1028 (6th Cir.), *cert. denied*, 508 U.S. 943, 113 S. Ct. 2423, 124 L. Ed. 2d 644 (1993).

## II.     DISCUSSION

Section 2255 of Title 28 of the United States Code permits a prisoner in custody under

---

[3]28 U.S.C. § 2255, provides, in part:

A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –
(1) the date on which the judgment of conviction becomes final;
(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

sentence of a federal court to move the court which imposed the sentence to vacate, correct, or set aside that sentence, on the grounds:

> the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . .

28 U.S.C. § 2255. This Court has jurisdiction under 28 U.S.C. § 1331. Petitioner has the burden of establishing any claim asserted in the petition. *See Bowers v. Battles,* 568 F.2d 1 (6th Cir. 1977); *Mayes v. United States,* 93 F. Supp. 2d 882, 886 (E.D. Tenn. 2000).

Where a constitutional error is alleged, in order to obtain relief under § 2255 the record must reflect a constitutional error of such magnitude it had a substantial and injurious effect or influence on the proceedings. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 1721-22, 123 L. Ed. 2d 353 (1993); *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999). "To prevail under 28 U.S.C. § 2255, a defendant must show a 'fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process.'" *Gail v. United States*, 21 F.3d 107, 109 (6th Cir. 1994) (citing *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)). Thus, "[a] motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001).

Petitioner argues the Court should grant his Petition because (1) his constitutional right to confront certain witnesses was violated; (2) the Government presented false testimony at trial; (3)

the Government failed to disclose exculpatory evidence; and (4) his counsel provided ineffective assistance of counsel at all stages of the proceedings (Court File No. 2).

With the exception of a claim of ineffective assistance of counsel, a petitioner procedurally defaults a claim by failing to raise it on direct review. *See Bousley v. United States*, 523 U.S. 614, 621, 118 S. Ct. 1604, 1610, 140 L. Ed. 2d 828 (1998). Petitioner did not raise any of his non-ineffective assistance of counsel claims on direct review. A procedurally defaulted claim may only be raised in a § 2255 motion if the petitioner can first demonstrate either (1) "cause" to excuse his failure to raise the claim previously and actual "prejudice" resulting from the alleged violation, or (2) "actual innocence." *Id.* at 622, 118 S. Ct. at 1611; *Peveler v. United States*, 269 F.3d 693, 698-700 (6th Cir. 2001). Petitioner has not attempted to demonstrate "cause" on his first three claims or his "actual innocence." Nevertheless, the Court will proceed to address the merits of Petitioner's first three claims because Petitioner would not be entitled to relief even if those claims had not been procedurally defaulted.

## A. Confrontation Clause

Petitioner contends he was denied his rights under the Confrontation Clause because he had no opportunity to cross-examine (1) co-conspirator Douglas Daigle ("Daigle"), who committed suicide prior to trial; or (2) co-conspirator Ted Roberts ("Roberts"), who was missing and presumed dead at the time of trial. At trial, Daigle's wife, Capri Daigle ("Capri"), and her mother, Dena Farmer ("Farmer"), testified as to statements made to them by Daigle and Roberts. Petitioner's counsel argued on appeal these statements were improperly admitted at trial. *Smith*, 320 F.3d at 654. The Sixth Circuit held this Court "did not abuse its discretion in ruling that the out-of-court statements were admissible" under Fed. R. Evid. 801(d)(2)(E). *Id.* at 654-55.

8

In *Bourjaily v. United States*, 483 U.S. 171, 182-84 (1987), the United States Supreme Court held co-conspirator's statements are not within the hearsay rules. Therefore, the admission of the statements did not violate Petitioner's Confrontation Clause rights. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980) (holding an out-of-court statement offered for the truth of the matter asserted satisfies the Confrontation Clause if there were adequate indicia of reliability because the statement either fell within a "firmly rooted hearsay exception," or otherwise bore "particularized guarantees of trustworthiness.").

Several years after Petitioner's trial, the Supreme Court issued its opinion in *Crawford v. Washington*, 541 U.S. 36 (2004), which changed the landscape of Confrontation Clause jurisprudence. This decision, however, is not retroactively applicable to habeas petitions. *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005); *Brown v. Uphoff*, 381 F.3d 1219, 1226-27 (10th Cir. 2004). Regardless, even if *Crawford* applied, the "admission of statements that meet the requirements of Rule 801(d)(2)(E) . . . are not testimonial in nature" and therefore do not implicate Sixth Amendment right to confrontation. *United States v. Martinez*, 430 F.3d 317, 329-30 (6th Cir. 2005). Thus, Petitioner's Confrontation Clause rights were not violated under the law that controlled at the time of trial or under current law. Accordingly, the Court concludes his Confrontation Clause claim is without merit and will be **DISMISSED**.

### B.     False Testimony

Petitioner asserts Federal Bureau of Investigation ("FBI") Special Agents Phil Krumm ("Krumm") and Ralph Perrigo ("Perrigo")[4] falsely testified at trial Petitioner had told them he

---

[4] The Court will periodically refer to Krumm and Perrigo in this memorandum as "the FBI agents."

prevented a rape during the Knoxville home invasion. In support of his position, Petitioner offers the purported affidavit of Edward Hodge, who was present during Petitioner's interview with Krumm and Perrigo.[5] In the affidavit, Mr. Hodge states "At no time did I hear [Petitioner] confess to being the man who stopped [the rape]" (Court File No. 2, Exh. A).

At most, Mr. Hodge's testimony, if presented at trial, would have suggested to the jury Petitioner may not have told the FBI agents he prevented a rape during the Knoxville home invasion because Mr. Hodge did not hear Petitioner make that statement. However, the testimony would not have contradicted other substantial evidence Petitioner was involved in the Knoxville bank extortion.[6] Thus, even though Mr. Hodge's testimony was not presented at trial, Petitioner has not shown the absence of his testimony resulted in a fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process.

Petitioner also argues the testimony of Krumm and Perrigo was false because there are no records to support their testimony. This argument is related to his request for documents under the Freedom of Information Act, 5 U.S.C. § 552, *et seq.* ("FOIA"). Petitioner made a request for certain documents pursuant to the FOIA and the documents he received in response to his request did not relate to the Knoxville, Chattanooga, or Clarksville bank robberies. As such, he argues, Krumm and Perrigo committed perjury. The Court agrees with the Government's characterization of this claim

---

[5] It is unclear from the parties' briefs what Mr. Hodge's relationship with Petitioner was at the time he was being interviewed by the FBI agents. In his brief, Petitioner refers to Mr. Hodge as "Rev. Ed. Hodge" (Court File No. 2, p. 9). This suggests Mr. Hodge was Petitioner's Minister.

[6] In addition to the Krumm and Perrigo's testimony, Capri testified Petitioner assisted in the surveillance leading up to the abduction of the Farrys (Court File No. 160, October 13, 2000 Trial Transcript, at pp. 711-14). Further, Capri testified after the money was stolen from the First American bank in Knoxville, Petitioner's cut was delivered to him at his house by Roberts and Farmer (*Id.* at 725, 729).

10

as "wholly frivolous" (Court File No. 6, p. 12). There simply is no relation between the lack of documents Petitioner received pursuant to his FOIA request and his allegation Krumm and Perrigo committed perjury. Petitioner has the burden of proving his claims. Undoubtably, he has not met his burden in proving Krumm and/or Perrigo committed perjury.

Accordingly, Petitioner's claims based on the alleged false testimony of Krumm and Perrigo will be **DISMISSED**.

### C.     Failure to Disclose Evidence

Next, Petitioner argues the Government failed to disclose "the fact that . . . Daigle . . . was an FBI informant, during the time of the alleged conspiracy" (Court File No. 2, p. 12). Petitioner contends if the Government had disclosed this "fact," he would have had a defense to the conspiracy charge. The Government responds it "has no knowledge supporting [P]etitioner's allegation and [it] believes [the allegation] to be completely false" (Court File No. 6, p. 10).

"[P]roof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction." *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984). However, Petitioner has offered no credible evidence supporting his theory Daigle was a government agent. He simply quotes portions of an indictment presented to a grand jury in Birmingham, Alabama that accuses Daigle of committing the crime of bank extortion in 1993. Even if this somehow proves Daigle was a government agent in that case, there is no proof he was an agent or informant during the events that led to Petitioner's indictment in this case. The bank robberies in this case occurred in a different state and in later years (1995 and 1996). Nonetheless, even assuming Daigle was a government agent, Petitioner's conviction would still stand because there were other co-conspirators involved who were not government agents or paid informants. *See*

*United States v. Cornell*, 162 Fed. App'x 404, 416 (6th Cir. 2006) ("By focusing on [the government informant's] status and testimony, [the defendant] ignores the large number of other co-conspirators who testified that he was part of a multi-person conspiracy . . . . [W]e hold a reasonable juror could have found [the defendant] guilty of conspiracy").

Additionally, Petitioner asserts the Government failed to disclose Krumm and Perrigo's Knoxville grand jury testimony that contradicted their trial testimony (Court File No. 2, p. 10). The Government responds the agents never testified before a Knoxville grand jury in this case or in any other related case (Court File No. 6, p. 15, n. 3). Other than his bald assertion these FBI agents told a different story when testifying before a Knoxville grand jury, Petitioner has not presented a transcript of the Knoxville grand jury testimony or any other evidence the FBI agents made prior inconsistent statements. Petitioner has the burden of proving he is entitled to relief. He has not met his burden.

For these reasons, the Court will **DISMISS** Petitioner's claims based on the Government's failure to disclose evidence.

### D.     Ineffective Assistance of Counsel Claims

Petitioner asserts he was denied effective assistance of counsel for the following reasons:

(1) counsel did not raise a Confrontation Clause objection to the testimony of Capri and/or Farmer at trial or on appeal;

(2) counsel failed to file a motion to suppress his statement about preventing a rape during the Knoxville home invasion;

(3) counsel did not call Edward Hodge as a witness or use his grand jury testimony to impeach the FBI agents;

(4) counsel did not expose Krumm and Periggo's "perjured" testimony;

(5) counsel failed to obtain DNA samples from the Roberts family; and

(6) counsel did not challenge the constitutionality of the sentencing guidelines.

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S. Ct. at 2064. As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the petitioner. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable

professional judgment." *Id*. at 690, 104 S. Ct. at 2066. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586, 91 L. Ed. 2d 305 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691, 104 S. Ct. at 2066. The *Strickland* Court further held both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

The Court will now address the grounds upon which Plaintiff rests his ineffective assistance of counsel claims.

### 1. Confrontation Clause

As the Court previously discussed, the testimony of Capri and Farmer did not violate any of

14

Petitioner's rights under the Confrontation Clause. Thus, any failure to raise a Confrontation Clause objection with respect to their testimony was not deficient and Petitioner was not prejudiced. Therefore, the Court will **DISMISS** Petitioner's claim for relief on this ground.

### 2. Motion to Suppress

Petitioner contends his attorney should have moved to suppress his admission to FBI agents he prevented a rape during the Knoxville home invasion. This argument is curious because as already mentioned, Defendant argues he never made the statement. If the statement was never made, then why would counsel need to suppress it? Regardless, Petitioner posits the inculpatory statement should have been suppressed because he was not given any *Miranda* warnings prior to making the statement. Petitioner contends *Miranda* warnings should have been given to him because the "files and records of the case" show at the time he made the statement he was a "suspect" (Court File No. 2, p. 17).

Petitioner's argument is without merit. The fact he was a suspect "does not, without more, suggest that *Miranda* warnings were required." *Biros v. Bagley*, 422 F.3d 379, 390 (6th Cir. 2005). Accordingly, the Court will **DISMISS** Petitioner's claim of ineffective assistance of counsel on this ground.

### 3. Edward Hodge

Petitioner posits his counsel was ineffective because she did not call Mr. Hodge to testify at trial. Presumably, Mr. Hodge would have testified he did not hear Petitioner tell the FBI agents he was the one who prevented Mrs. Farry from being raped. "A defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant."

*Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).   In light of the FBI agents' testimony and other incriminating evidence presented at trial, Petitioner's counsel had no obligation to call Mr. Hodge because Mr. Hodge would not have exculpated him.   Counsel's decision not to call Mr. Hodge to testify can aptly be described as "trial strategy," *Strickland*, 466 U.S. at 689, and cannot result in a conclusion counsel was deficient.   Additionally, and for the same reasons, the Court also concludes counsel's failure to call Hodge to testify at trial did not prejudice Petitioner. *See Wiley v. Hurley*, 2006 WL 1132960, at * 5 (S.D. Ohio Apr. 25, 2006) (unpublished) ("Courts are reluctant to find . . . an attorney has been ineffective for failing to call a witness, because it is difficult to show . . . a witness's testimony could have changed the outcome of the trial" (citation and quotation omitted))

Petitioner also asserts he was provided with ineffective assistance of counsel because Mr. Hodge's grand jury testimony was not used to impeach the FBI agents' testimony.[7]   Petitioner's argument again lacks merit.   Had the Government objected, Mr. Hodge's grand jury testimony would likely have been excluded for at least two reasons.   First, the Federal Rules of Evidence forbid a witness from testifying about "a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."   Fed. R. Evid. 602.   There is no indication the FBI agents had personal knowledge of Mr. Hodge's grand jury testimony.

Second, it was likely the Court would also have excluded Mr. Hodge's grand jury testimony because it would have been "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).   Such hearsay evidence is "not admissible . . . ." Fed. R. Evid. 802.   Although there

---

[7] Petitioner did not provide the Court with Mr. Hodge's grand jury testimony.   Therefore, the Court is uncertain how useful his testimony would have been in cross-examining the FBI agents.

are exceptions to this rule, the Court does not think any of them would apply to Mr. Hodge's grand jury testimony. Thus, due to the likelihood the grand jury testimony would have been excluded, counsel was not deficient in failing to use Mr. Hodge's grand jury testimony when she cross examined the FBI agents and for the same reasons, Petitioner was not prejudiced by counsel's failure.

Accordingly, Petitioner's claims of ineffective assistance of counsel based on Mr. Hodge will be **DISMISSED**.

### 4. FBI Agents' Testimony

Another ground upon which Petitioner bases his contention he was provided with ineffective assistance of counsel, is his counsel's failure to object to Krumm and Perrigo's "false" testimony. For the reasons already discussed, there is no evidence the testimony was perjured. Even if Mr. Hodge would have testified he never heard Petitioner make the statement he prevented a rape during the Knoxville home invasion, this would not have established the FBI agents' testimony was perjured. Rather, it would have merely established at best Mr. Hodge remembered events differently than the FBI agents. Petitioner's claim of ineffective assistance on this ground is entirely frivolous and will be **DISMISSED**.

### 5. DNA Evidence

Next, Petitioner argues his counsel was constitutionally ineffective because she failed to obtain DNA samples from Robert's family. Petitioner asserts the DNA evidence would have proven his innocence because it would have shown Roberts, not he, was at the Farry's house during the Knoxville home invasion. As the Government points out, any such DNA evidence would not have

proven his innocence, but at best would have only proven Roberts was also inside the Farry's home.

Regardless, even if the DNA evidence could prove Petitioner was not inside the Farry's home it

would not refute the evidence presented at trial he participated in the surveillance of the Farry's

home and was given a share of the money stolen from the First American Bank. As a member of

the conspiracy, Petitioner was responsible for the acts of his co-conspirators, of which Roberts was

one. Therefore, even if Roberts was the only one inside the Farry's home, Petitioner would still

have been guilty of the offenses Roberts committed. *See United States v. Hughes*, 895 F.2d 1135,

1140 (6th Cir. 1990) ("A conspirator need not have agreed to commit every crime within the scope

of the conspiracy, so long as it is reasonable to infer that each crime was intended to further the

enterprise's affairs . . . . Moreover, it is not necessary for each conspirator to participate in every

phase of the criminal venture, provided there is assent to contribute to a common enterprise."). For

these reasons, Petitioner has failed to show how his counsel was deficient or how he was prejudiced.

Accordingly, the Court will **DISMISS** Petitioner's claim for relief on this ground.

### 6.    Constitutionality of the Sentencing Guidelines

Petitioner contends he received ineffective assistance of counsel because his attorney failed

to object to the constitutionality of the Guidelines. Several years after Petitioner was sentenced, the

United States Supreme Court rendered its decisions in *Blakely v. Washington*, 542 U.S. 296 (2004)

and *United States v. Booker*, 543 U.S. 220 (2005). In *Booker*, the Supreme Court declared "the

Guidelines violate the Sixth Amendment right to a jury trial where they provide for a sentence in

excess of the maximum authorized by the facts established by a plea of guilty, a jury verdict, or a

defendant's own admissions." *United States v. Phelps*, 366 F. Supp. 2d 580, 584 (E.D. Tenn. 2005)

(citing *Booker*, 543 U.S. at 244).

18

In arguing his counsel was ineffective for not objecting to the constitutionality of the Guidelines, Petitioner assumes "his counsel acted unreasonably in failing to predict [the holdings in] . . . *Blakely* and *Booker* . . . ." *United States v. Burgess*, 142 Fed. App'x 232, 241 (6th Cir. June 22, 2005) (unpublished). "As a matter of law, there simply is no basis for" Petitioner's "assertion that his counsel's failure to predict this novel line of authority fell below an objective standard of reasonableness." *Id.* (citation omitted). Thus, Petitioner's claim fails the deficiency prong.

Petitioner's claim also fails the prejudice prong because the holdings in *Blakely* and *Booker* do not apply retroactively to collateral proceedings. *Humphress v. United States*, 398 F.3d 855, 860 (6th Cir. 2005). Since neither prong of the *Strickland* test is satisfied, the Court will **DISMISS** this claim.

## III. <u>CONCLUSION</u>

For the reasons stated above, the Court holds Petitioner's conviction and sentencing were not in violation of the Constitution or laws of the United States, and the motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 will be **DENIED**.

The Court must now consider issues that may arise if Petitioner files a notice of appeal. Section 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion.[8] Section 2255 now incorporates the old habeas procedure of issuing or denying a

---

[8] The Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915(a)(3), does not apply to appeals of orders denying § 2255 motions. *Hereford v. United States*, 117 F.3d 949, 951 (6th Cir. 1997); *cf. McGore v. Wrigglesworth*, 114 F.3d 601, 610 (6th Cir. 1997) (instructing courts regarding proper PLRA procedures in prisoner civil-rights cases). Rather, to seek leave to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the $105 filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must seek permission from the district court under Rule 24(a) of the

certificate of probable cause, now renamed a certificate of appealability. No § 2255 petitioner may appeal without this certificate. District judges may issue certificates of appealability under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which codifies the standard for issuing a certificate of probable cause originally articulated in *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983). *See Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997). "A certificate of probable cause requires petitioner to make a 'substantial showing of the denial of [a] federal right.'" *Barefoot*, 463 U.S. at 893, 103 S. Ct. at 3394. *See also* 28 U.S.C. § 2253(c)(2). The standard is perhaps best phrased as follows:

> In requiring a "question of some substance," or a "substantial showing of the denial of [a] federal right," obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are "adequate to deserve encouragement to proceed further."

*Gordon v. Willis*, 516 F. Supp. 911, 913 (N.D. Ga. 1980) (quoting *United States ex rel. Jones v. Richmond*, 245 F.2d 234 (2d Cir.), *cert. denied*, 355 U.S. 846, 78 S. Ct. 71, 2 L. Ed. 2d 56 (1957)).

In this case, Petitioner's claims are clearly without merit, and he cannot present a question of some substance about which reasonable jurists could differ. The Court therefore **DENIES** a certificate of appealability.

Fed. R. App. P. 24(a) further requires the district court to certify in writing whether the appeal is taken in good faith. For the same reasons the Court denies a certificate of appealability, the Court determines that any appeal in this case would not be taken in good faith. It is therefore

---

Federal Rules of Appellate Procedure. *Hereford*, 117 F.3d at 952. If the motion is denied, the prisoner may renew the motion in the appellate court.

**CERTIFIED**, pursuant to Fed. R.App. P. 24(a), that any appeal in this matter by Petitioner is not taken in good faith, and he may not proceed on appeal *in forma pauperis*. *United States v. Atkins*, 171 F. Supp. 2d 769 (W.D. Tenn. 2001). No certificate of appealability will issue as Petitioner has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c).

An Order shall enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**